Commonwealth, Appellant, *v.* Jones, et al.

Argued March 27, 1974.  Before WATKINS, P. J., JACOBS, HOFFMAN, CERCONE, PRICE, VAN DER VOORT, and SPAETH, JJ.

*David Richman,* with him *Joseph C. Murray,* Assistant District Attorneys, *Richard A. Sprague,* First Assistant District Attorney, and *F. Emmett Fitzpatrick,* District Attorney, for Commonwealth, appellant.

*John W. Packel,* with him *Anne F. Johnson,* Assistant Defenders, *Vincent J. Ziccardi,* Defender, *Timothy A. Crawford, Ricardo Calvin Jackson,* and *Ronald J. Brockington,* for appellees.

OPINION BY CERCONE, J., June 21, 1974:

This appeal by the Commonwealth arises from the lower court's granting of the appellees' motion to suppress evidence discovered after an allegedly illegal search and seizure. The lower court cited the following comprehensive reasons for granting the motion to suppress: "(1) The warrant did not contain information upon which the magistrate could independently conclude there was probable cause for the search. In fact, no probable cause existed at the time the warrant was issued because of a lapse of at least twenty-one days between the time the alleged contraband was seen and the time the warrant was issued. (2) The warrant was not properly executed. (3) The items were not properly seized by the police and are not admissible in evidence against defendants." The grim details of the incidents which preceded the issuance and execution of the warrant are best described by the warrant itself.

"On Saturday, August 29, 1970, at 8:30 P.M., Park Policeman James Harrington was shot in the mouth on the highway, 63rd and Catherine Streets, by an unknown Negro male who escaped through the park. One hour later, the body of Sergeant Frank Von Colln, No.

12, Park Police, was found shot, five times in the Operations Room, Cobbs Creek Park Guardhouse. Approximately five minutes after the shooting of Policeman Harrington, Hugh Williams, resident 664 North 54th Street, was apprehended on the highway, Felton and Catherine, for possession of a .32 automatic with two additional clips and an army fragmentation hand grenade. Within 25 yards where he was apprehended a bag was found on the highway containing a .38 caliber revolver, a quantity of .38 caliber and .32 caliber ammunition and an army fragmentation hand grenade, as well as various articles of clothing.

"An identical type of hand grenade was also found at the scene of the shooting of Park Guard Harrington.

. . .

"Hugh Williams admitted that he was part of a conspiracy to blow up the Park Guard Station at 63rd and Catherine Streets and has named Robert and Alvin Joyner, Russell Shoates, Fred Belagon, Burton and another known to him as Ricky, as his co-conspirators.

"Jerry Joyner, 27, Negro male, residence 5440 Osage Avenue, brother of Robert and Alvin Joyner, *was brought into* Homicide Headquarters and told detectives that on Monday morning, about three weeks ago he went to 3625 Wallace Street to pick up some newspapers. He met his brother Alvin there, and Alvin took him to the second floor where he got a shotgun from the closet and showed him how to use it. Alvin also had a .38 automatic and had him try pulling the trigger and asked him to go out and shoot some pigs. He said he didn't want any of that. Alvin put the guns away and then took him down to the kitchen. He opened the cabinet underneath the sink and showed him three hand grenades in the floor, *identical* to those found at the scene.

"From the interview with Jerry Joyner it was learned he resides in and is employed in Philadelphia.

He appeared sober, not under the influence of drugs and a competent adult male. He *voluntarily* came to Police Headquarters and furnished this information to detectives.

"Jerry Joyner also stated that Alvin Joyner is a member of the Black Panther Party and that 3625 was their party headquarters where weapons were kept.

"Because of his frank statement as to the presence of these *identical* weapons and other weapons at the Black Panther Party Headquarters at the above address, and because of his statement to his brother's knowledge of the weapons at the above address, and because of the statement that his brother admitted to him that he had used such weapons to kill a 'pig', I have reason to believe that weapons are being stored in violation of the law and that weapons used in the murder of Sergeant Von Colln are being stored at the above location." (Emphasis added throughout.)

At the suppression hearing, the Commonwealth introduced testimony by three officers who were involved in either the preparation or execution of the warrant. While their testimony was both candid and predominantly favorable to the Commonwealth's case, certain aspects of the testimony were damaging.

## I.

Officer Verbrugghe, who prepared the warrant, testified that he had no first hand knowledge of the circumstances under which Jerry Joyner came to the police station, other than that the police brought him there. Officer Verbrugghe apparently assumed from Joyner's attitude and conduct that he had come voluntarily. Even though the warrant states that Joyner "was brought into" the police station, the lower court felt that the use of the word "voluntarily" was a misstatement of fact calculated to mislead the issuing

magistrate. Similarly, the court felt that the use of the terminology "identical weapons," in relation to the grenades which Joyner saw at the Wallace Street address, was improper since Joyner only identified a picture of a grenade found at the scene as being the same type as the three he had seen at Wallace Street. The court cited these misstatements in the warrant as one reason for suppressing the evidence.

In *Commonwealth v. D'Angelo*, 437 Pa. 331 (1970), the Supreme Court found a warrant defective because it misrepresented that the accused, whose premises were to be searched, had been identified by the victim, when in fact the victim was very hesitant to do so and would only state that he thought D'Angelo was the man who had attempted to rob him. *D'Angelo* was cited with approval in *Commonwealth v. Hall*, 451 Pa. 201 (1973), where the Supreme Court held that the defendant has the right to inquire into prior arrests based upon information which the police allege their reliable, unnamed informant provided. A concurring opinion by Justice NIX (joined by Justice POMEROY and Chief Justice JONES) indicates, however, that *D'Angelo* and *Hall* are applicable only to deliberate misstatements of *material facts* by the police. A material fact is defined therein to be one without which probable cause to search would not exist. Such a distinction is, of course, desirable since the warrants are ordinarily drafted in haste from sketchy notes, and minor discrepancies are virtually unavoidable.

Clearly, such material misstatements did not occur in the instant case. Even if Joyner's appearance at police headquarters had been "involuntary," and he had only identified the grenades he saw as being similar to the one in the picture shown to him by Officer Verbrugghe, there would still be more than enough information for the magistrate to find probable cause to issue the warrant. Especially in light of the

shocking nature of the assaults and murder, involved herein, the officer's slight exaggerations are understandable although they are not justifiable. As the Supreme Court said in *United States v. Ventresca*, 380 U.S. 102 (1965): "[Search warrants] are normally drafted by nonlawyers in the midst and haste of a criminal investigation. Technical requirements of elaborate specificity once exacted under common law pleadings have no proper place in this area. *A grudging or negative attitude by reviewing courts toward warrants will tend to discourage police officers from submitting their evidence to a judicial officer before acting." Id.* at 108. See also *United States v. Harris*, 403 U.S. 575 (1971). We therefore find that the misstatements of fact which appear in the warrant are not sufficient to require suppressing the evidence in this case.

The lower court also felt that Joyner's statements concerning his seeing the weapons during his Wallace Street visit did not constitute probable cause since, three weeks having elapsed since he had seen the weapons, the information was stale. Again, we disagree.

The landmark Supreme Court decision in *Sgro v. United States*, 287 U.S. 206 (1932) established that the information which forms the basis for the finding of probable cause "must be of facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause at that time. *Whether the proof meets the test must be determined by the circumstances of each case."* (Emphasis added). *Id.* at 210-11. The analysis to be employed in determining "staleness" is similar to that which we employed most recently in *Commonwealth v. Allen*, 227 Pa. Superior Ct. 157, 162 (1974). Under that analysis, the Court should look to, inter alia, the nature and quantity of the items to be seized, the time lapse involved, and the ease with which the items may be disposed of. In the instant case, the search warrant referred to a substantial cache

of weapons which allegedly were being kept for the purpose of committing murder.[1] Coupled with Williams' information which linked Alvin Joyner with the weapons shortly before the warrant was sworn, there was a substantial basis for the magistrate to determine that the weapons, or some of them, could still be found in the place to be searched. "It was certainly reasonable for a magistrate, concerned only with a balancing of probabilities, to conclude that there was a reasonable basis for a search:" *United States v. Harris, supra.* See also *Spinelli v. United States*, 393 U.S. 410, 419 (1969); *Jones v. United States*, 352 U.S. 257, 270-71 (1960).[2]

## II.

The lower court also found error in the manner in which the police executed the warrant in the instant case. The evidence indicated that the police descended upon 3625 Wallace Street at 6:00 a.m. on August 31,

---

[1] In *Bastida v. Henderson*, 487 F. 2d 860, 864 (5th Cir. 1974), the court stated: "[W]e recognize that this alleged robbery was not a continuing offense but it is equally true that the pistols were most likely to remain as continuing articles. They were not liable to the evaporation or consumption that ordinarily befalls whiskey. . . ."

[2] The lower court also indicated that there was an insufficient basis for determining the reliability of the informants. This finding clearly lacks merit. Among other things, Jerry Joyner was a named informant and implicated his brother when he supplied the police with the information. Furthermore, his lead was corroborated by Williams whose statement was reliable because it was self-incriminating. See *Commonwealth v. Matthews*, 446 Pa. 65, 70 (1971); *Commonwealth v. Whitehouse*, 222 Pa. Superior Ct. 127, 133 (1972). Finally, Jerry Joyner's information provided a detailed description of the incident and the location of the weapons. See *Spinelli v. United States, supra,* at 417; and, as we stated in *Commonwealth v. Bove*, 221 Pa. Superior Ct. 345, 349 (1972), "If the information of the informant is otherwise reliable, this lack of prior informing will be no bar to a showing of probable cause."

1970, attended by a virtual army consisting of more than twenty-five men including several "civilian" crime lab technicians. The unrefuted testimony of the two officers who testified about the incident was that the occupants opened fire on the police after several police announcements of their identity and purpose produced only the repeated response, "Who is it." While the testimony indicated that the police did return the fire briefly, it was tear gas that eventually forced the occupants to surrender. Also unrefuted was the officers' testimony, and photographs apparently supported this testimony, that the occupants threw their guns onto the sidewalk before they came out.

The damaging features of the Commonwealth's case were the failure to produce spent shell casings from inside the building after an exhaustive search, and photographs which showed that several of those arrested were nude.[3] Those factors, coupled with the size and armament of the search party, led the lower court to believe that the police had arrived itching for a confrontation. The court further concluded that if any shots were fired, they were fired by the police. In so finding, the court announced that the officers' testimony concerning who fired at whom first was "uncorroborated." Of course, the court meant uncorroborated by any physical evidence, since the testimony of each officer corroborated the other's.

The major difficulty with the lower court's conclusion is that the court sustained a defense objection to the Commonwealth's attempt to put the technicians and others who conducted the search on the stand. The following testimony and colloquy which appear

---

[3] There was no evidence that the police had stripped those people, however. It is at least equally likely, given the fact that these events took place during the "dog days" of August, that some of the occupants had foregone modesty for comfort.

on the record indicate the arbitrary and capricious nature of the court's finding. Q. I think you stated on direct examination or on cross-examination by Mr. Brockington that the reason that the furniture was removed out of the house was to locate any of the bullets that may have been fired at the police officers. Is that correct? A. The casings. Q. The casings from the bullets, the spent shells? A. Yes. Q. Were they ever recovered? A. There were casings recovered. Q. Were the casings that were fired at the police officers, were they recovered? MR. DRUCKER: Objection. THE COURT: What is the basis? MR. DRUCKER: The basis, Your Honor, that he is not the person who searched the house and there has been no groundwork laid that he was. THE COURT: You better lay a foundation. MR. DeSimone: Would Your Honor indulge me? THE COURT: Very well. (Pause.) BY MR. DeSimone: Q. Let me ask you this: You don't know whether the casings that were found in the building were the casings that were used to fire—as you said, to fire at the police officers. Is that correct? A. That they were the particular casings? Q. Yes. A. No, sir, I don't. MR. DRUCKER: I wish to put on the record there may be an argument as to open view, Your Honor, in this case. I also want to put on technicians as to where the evidence was found. MR. DeSimone: As to the technicians, Your Honor, if they are going to introduce the fruits of the search, I would strenuously object to that. THE COURT: I would sustain you on that. There is no question about that. *We are just concerned about the search warrant.* (Emphasis added.) The testimony indicates that casings were indeed found on the premises, but the court barred testimony on that issue by the technicians who conducted the search.

The scope of our review in the case of suppression of the Commonwealth's evidence is limited to whether the lower court's decision constituted "a capricious dis-

belief of the evidence or was a palpable abuse of discretion or was based upon an error of law": *Commonwealth v. Rowe*, 445 Pa. 454, 460 (1971); *Commonwealth v. Taper*, 434 Pa. 71, 77 (1969). While the burden upon the Commonwealth is weighty, it is not unbearable; and, we feel that they have borne it in the instant case.[4] Not only did the court demonstrate a capricious disbelief of the Commonwealth's evidence, but it erred in excluding evidence of a matter which *the defense* put into issue. It then compounded its error by citing the lack of proof on that issue as a basis for finding the execution of the warrant to be defective.

## III.

Finally, the lower court concluded that the police *seized* numerous articles which they did not have probable cause to believe to be "fruits, instrumentalities or evidence" of the alleged crimes.[5] Of course, so long as the search was conducted within permissible limits, the improper seizure of particular articles does not taint the search or the seizure of proper articles. Only those items improperly seized, or their poisoned fruit, are suppressible, since they are the only items with respect to which the defendants' Fourth Amendment rights

---

[4] As to the court's conclusion that the police staged such a massive raid to force a confrontation, it seems more likely that such a large force would act as a deterrent. The court neglected to consider that the police were attempting to search the premises of a group which, there was probable cause to believe, had the avowed and partially fulfilled intention of murdering policemen. Under such circumstances the police would have been foolhardy to appear with anything less than an impressive contingent of armed men.

[5] *Warden v. Hayden*, 387 U.S. 294 (1967). See also 68 Am. Jur. 2d Searches and Seizures §§112-13 (1973).

were violated.[6] Thus, while the police may not now make evidentiary use of articles improperly seized, they may still introduce into evidence those things found on the premises which were legally seized. Therefore, we will remand for another suppression hearing for the sole purpose of allowing the lower court to determine which items were illegally seized, and, therefore, not admissible into evidence.

Order of the lower court is reversed, and the case remanded for further proceedings consistent with this opinion.

---

[6] *Alderman v. United States*, 394 U.S. 165 (1969). See also *United States v. Dichiarinte*, 445 F. 2d 126 (7th Cir. 1971).

---

CONCURRING AND DISSENTING OPINION BY SPAETH, J.:

I join in Parts I and III of Judge CERCONE'S opinion. I believe, however, that on the remand the matter of how the warrant was executed should be inquired into further, and I therefore dissent from Part II.

HOFFMAN, J., joins in this opinion.