J-S66022-19 & J-S66023-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WASIM SHAZAD | : | |
| | : | |
| Appellant | : | No. 1423 EDA 2019 |

Appeal from the Judgment of Sentence Entered April 9, 2019
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0001354-2017

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| WASIM SHAZAD | : | |
| | : | |
| Appellant | : | No. 1424 EDA 2019 |

Appeal from the Judgment of Sentence Entered April 9, 2019
In the Court of Common Pleas of Montgomery County Criminal Division
at No(s): CP-46-CR-0007941-2017

BEFORE:  STABILE, J., NICHOLS, J., and FORD ELLIOTT, P.J.E.

MEMORANDUM BY NICHOLS, J.:                    **FILED NOVEMBER 10, 2020**

Appellant Wasim Shazad appeals from the judgments of sentence imposed following his convictions for receiving stolen property, failing to maintain proper records under the Precious Metal Act, and conspiracy[1] after a

_____

[1] 18 Pa.C.S. § 3925(a), 73 P.S. § 1933(a), and 18 Pa.C.S. § 903(a)(1), respectively.

non-jury trial. Appellant contends that the trial court erred when it denied his motion for change of venue and his motion to suppress evidence obtained pursuant to search warrants. Appellant also argues that the trial court erred by admitting improper prior bad acts evidence and allowing a police officer to testify about his independent recollection of a recorded conversation he had with Appellant after the trial court suppressed the recording. Appellant further claims that the trial court erred by admitting the suppressed recording at his sentencing hearing. Lastly, Appellant challenges the discretionary aspects of his sentence. We affirm.

We adopt the trial court's summary of the facts and procedural history relevant to this appeal. *See* Trial Ct. Op., 7/23/19, at 1-10, 25-27, 28-30. We add that Appellant's trial counsel did not file any post-sentence motions before the trial court ruled on trial counsel's motion to withdraw. On April 25, 2019, appellate counsel filed both an entry of appearance on behalf of Appellant and a motion for permission to file a post-sentence motion *nunc pro tunc*. The trial court denied that motion on April 26, 2019.

Appellant filed separate, timely notices of appeal on May 7, 2019.[2] Appellant subsequently filed court-ordered Pa.R.A.P. 1925(b) statements at each docket number, and the trial court issued a Rule 1925(a) opinion

---

[2] We consolidated the separate appeals, which involve the same underlying criminal episode and issues, for ease of disposition.

addressing Appellant's claims.   Appellant raises six issues for our review, which we summarize and reorder as follows:

> 1.  Whether the trial court erred in denying Appellant's motion for a change of venue from Montgomery County to Philadelphia County.
>
> 2.  Whether the trial court erred in denying Appellant's motion to suppress evidence obtained from his residence and business locations pursuant to search warrants.
>
> 3.   Whether the trial court erred in admitting prior bad acts evidence.
>
> 4.  Whether the trial court erred in allowing Officer James Scott to testify at trial from his independent recollection of the June 17, 2016 conversation with Appellant after the trial court suppressed the audio recording of the same conversation.
>
> [5.]   Whether the trial court imposed an unduly harsh and excessive sentence in sentencing the Appellant to an aggregate sentence of twenty[-]four to seventy[-]two months' incarceration and imposing the statutory maximum fines on each of Appellant's the convictions.
>
> [6.]   Whether the trial court erred in admitting the previously suppressed June 17, 2016 audio recording at Appellant's sentencing hearing.

Appellant's Brief at 4-6.

### Change of Venue

In his first issue, Appellant argues that the trial court erred in denying his motion to change venue from Montgomery County to Philadelphia County because there was an insufficient nexus between his criminal conduct and Montgomery County.  *Id.* at 12-15.

Our standard of review is as follows:

> The trial court's decision on [an] appellant's motions for change of venue/venire rests within the sound discretion of the trial judge, whose ruling thereon will not be disturbed on appeal absent an abuse of that discretion. Venue assumes the existence of jurisdiction and relates to the right of a party to have the controversy brought and heard in a particular judicial district. Venue is a procedural matter, generally prescribed by the Rules of Court.

*Commonwealth v. Brookins*, 10 A.3d 1251, 1258 (Pa. Super. 2010) (citations and some formatting omitted). Here, based on our review of the record, the parties' briefs, and the well-reasoned opinion of the trial court, we discern no abuse of discretion or error of law by the trial court. *See* Trial Ct. Op. at 11-14; *Brookins*, 10 A.3d at 1258.[3] The trial court thoroughly addressed Appellant's challenge to venue, and we affirm on the basis of the trial court's analysis of this issue. *See* Trial Ct. Op. at 11-14. Accordingly, Appellant is not entitled to relief on this claim.

**Motion to Suppress Items Seized Pursuant to Search Warrants**

In his second issue, Appellant argues that the trial court erred in denying his motion to suppress the evidence obtained pursuant to search warrants executed on his three jewelry stores. Appellant's Brief at 15-23. Appellant contends the search warrants were defective for two reasons: (1) that the warrants were overly broad, and (2) that the information in the affidavit of probable cause was stale. *Id.* at 17-23.

We have explained that:

---

[3] The trial court's citation on page twelve of its opinion should read "*Commonwealth v. Boring*, 684 A.2d 561, 566 (Pa. Super. 1996)."

- 4 -

[t]he legal principles applicable to a review of the sufficiency of probable cause affidavits are well settled. Before an issuing authority may issue a constitutionally valid search warrant, he or she must be furnished with information sufficient to persuade a reasonable person that probable cause exists to conduct a search. The standard for evaluating a search warrant is a "totality of the circumstances" test . . . . A magistrate is to make a practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place. The information offered to establish probable cause must be viewed in a common sense, nontechnical manner. Probable cause is based on a finding of the probability, not a *prima facie* showing of criminal activity, and deference is to be accorded a magistrate's finding of probable cause.

***Commonwealth v. Manuel***, 194 A.3d 1076, 1081 (Pa. Super. 2018) (*en banc*) (citations omitted and some formatting altered).

Here, based on our review of the record, the parties' briefs, and the well-reasoned opinion of the trial court, and we affirm on the basis of the trial court's analysis of this issue. ***See*** Trial Ct. Op. at 14-23; ***Manuel***, 194 A.3d at 1081. The trial court found that the affidavit supporting the search warrants contained sufficient probable cause, the search warrants were not overly broad, and that the information in the affidavit of probable cause was not stale. ***See*** Trial Ct. Op. at 14-23.[4] Therefore, Appellant is not entitled to relief on this claim.

---

[4] On page nineteen of the trial court's opinion, the citation should be "***Commonwealth v. Barba***, 460 A.2d 1103, 1107 (Pa. Super. 1983)."

**Appellant's Evidentiary Claims**

Appellant's third and fourth issues both relate to the admission of evidence. Appellant's third issue is that the trial court erred in admitting evidence of his prior bad acts pursuant to Pa.R.E. 404(b). Appellant's Brief at 23-27. Appellant's fourth issue concerns the testimony of Officer James Scott. *Id.* at 28-35. Prior to the start of trial, the trial court granted Appellant's motion to preclude the Commonwealth from introducing an audio recording of a June 17, 2016 conversation between Appellant and Officer Scott. *Id.* at 28-29. Appellant claims the trial court erred in allowing Officer Scott to testify regarding his independent recollection of that conversation. *Id.* at 29. Although the trial court eventually struck that portion of Scott's testimony, Appellant argues that the trial court could not render a fair verdict after hearing that testimony. *Id.* at 30, 34-35.

"The admission of evidence is committed to the sound discretion of the trial court and an appellate court may reverse only upon a showing that the trial court clearly abused its discretion." ***Commonwealth v. McFadden***, 156 A.3d 299, 309 (Pa. Super. 2017) (citation and quotation marks omitted). "The trial court will be reversed only if an error in the admission of evidence contributed to the verdict." *Id.* (citation omitted). "[A] trial court acting as the fact-finder is presumed to know the law, ignore prejudicial statements, and disregard inadmissible evidence." *Id.* (citation and quotation marks omitted).

Here, based on our review of the record, the parties' briefs, and the well-reasoned opinion of the trial court, we discern no abuse of discretion or error of law by the trial court regarding the admission of prior bad acts evidence. **See** Trial Ct. Op. at 23-25; **McFadden**, 156 A.3d at 309. The trial court thoroughly addressed Appellant's challenge to the admission of his prior bad acts and we affirm on the basis of the trial court's analysis of this issue. **See** Trial Ct. Op. at 23-25.[5] The trial court concluded that the prior bad acts evidence was admissible to show Appellant knew that the property he purchased was probably stolen and the probative value of the evidence was not outweighed by the danger of unfair prejudice. **See id.** Therefore, Appellant is not entitled to relief on his third issue.

Based on our review of the record, the parties' briefs, and the trial court's analysis, we discern no abuse of discretion by the trial court with respect to Officer Scott's testimony. **See** Trial Ct. Op. at 25-27; **McFadden**, 156 A.3d at 309. The trial court thoroughly addressed its rulings regarding Officer Scott's testimony, including striking portions of his testimony after determining he lacked an independent recollection of the conversation he had with Appellant on June 17, 2016, and that the trial court did not consider any of the stricken testimony in reaching its decision. **See** Trial Ct. Op. at 25-27; **see also McFadden**, 156 A.3d at 309 (stating "a trial court acting as the fact-

---

[5] We affirm on the basis of the trial court's opinion except insofar as the trial court cited to the dissenting opinion in **Commonwealth v. Kinard**, 95 A.3d 279, 294-95 (Pa. Super. 2014) (*en banc*) (Donohue, J., dissenting).

finder is presumed to . . . disregard inadmissible evidence."). Therefore, we affirm on the basis of the trial court's opinion with respect to this issue.

**Discretionary Aspects of Sentence**

Appellant also challenges the discretionary aspects of his sentence, arguing that the trial court's aggregate sentence of two to six years' incarceration, in addition to imposing the statutory maximum fines for every count, was manifestly unjust. Appellant's Brief at 39-43.

"Challenges to the discretionary aspects of sentencing do not entitle an appellant to review as of right." *Commonwealth v. Derry*, 150 A.3d 987, 991 (Pa. Super. 2016) (citation omitted). Before reaching the merits of such claims, we must determine:

> (1) whether the appeal is timely; (2) whether Appellant preserved his issues; (3) whether Appellant's brief includes a [Pa.R.A.P. 2119(f)] concise statement of the reasons relied upon for allowance of appeal with respect to the discretionary aspects of sentence; and (4) whether the concise statement raises a substantial question that the sentence is inappropriate under the sentencing code.

*Commonwealth v. Malovich*, 903 A.2d 1247, 1250 (Pa. Super. 2006) (citation omitted). We have explained that "[t]o preserve an attack on the discretionary aspects of sentence, an appellant must raise his issues at sentencing or in a post-sentence motion. Issues not presented to the sentencing court are waived and cannot be raised for the first time on appeal." *Id.* at 1251 (citations omitted).

Here, Appellant did not argue that his sentence was manifestly unjust after he was sentenced. **See** N.T. Sentencing Hr'g, 4/9/19, at 62-64. Nor did he file a post-sentence motion. Therefore any challenges Appellant has to the discretionary aspects of his sentence have been waived. **See Malovich**, 903 A.2d at 1250-51.[6]

**Admission of the Recorded Conversation at Sentencing**

Appellant's final issue relates to the admission of the audio recording of his conversation with Officer Scott on June 17, 2016 during the sentencing hearing. Appellant's Brief at 36-39. Appellant objected to the recording being played at sentencing because the trial court previously suppressed the recording because it was obtained in violation of the Wiretap Act.[7] **Id.** at 36. The trial court overruled Appellant's objection and listened to the recording. **Id.** Appellant argues that the trial court erred in relying on the federal case law interpreting the Fourth Amendment's exclusionary rule as not applicable

---

[6] Moreover, even if Appellant had preserved a discretionary aspects challenge, it would not merit relief. "Sentencing is a matter vested in the sound discretion of the sentencing judge, and a sentence will not be disturbed on appeal absent a manifest abuse of discretion." **Commonwealth v. Raven**, 97 A.3d 1244, 1253 (Pa. Super. 2014) (citation omitted). The trial court thoroughly addressed the factors it considered when imposing Appellant's sentence and provided support for imposing a sentence in the aggravated range of sentencing guidelines and for imposing the statutory maximum fines. **See** Trial Ct. Op. at 28-33. Therefore, even if Appellant's challenge to the discretionary aspects of his sentence had not been waived, we would affirm on the basis of the trial court's opinion. **See id.; see also Raven**, 97 A.3d at 1253.

[7] 18 Pa.C.S. §§ 5701-5782.

to sentencing. *Id.* at 37-38. Appellant contends that Article I, Section 8 of the Pennsylvania Constitution offers greater protections than the Fourth Amendment and therefore the recording should not have been admitted at sentencing. *Id.* at 37-39. Appellant did not cite any case law holding that, under the Pennsylvania Constitution, the exclusionary rule applies to sentencing hearings. *Id.* at 36-39.

The Commonwealth responds that Appellant waived any constitutional challenge to the admission of the audio recording at sentencing because he is raising it for the first time on appeal. Commonwealth's Brief at 42-46. More specifically, the Commonwealth argues that Appellant moved to suppress the recording because it was obtained in violation of Section 5704 of the Wiretap Act, and that Appellant did not cite Article I, Section 8 in his motion to suppress or at the sentencing hearing. *Id.* at 42-43. The Commonwealth contends that issues, even constitutional claims, not presented to the trial court at the earliest opportunity are waived on appeal. *Id.* at 44-45. Lastly, the Commonwealth argues that this issue is waived because Appellant did not raise in it his 1925(b) statement. *Id.* at 45-46.

This Court has previously held:

> [o]ur Pennsylvania Rules of Appellate Procedure and our case law set forth the well-established requirements for preserving a claim for appellate review. "Issues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). This requirement bars an appellant from raising a new and different theory of relief for the first time on appeal.

*Commonwealth v. Phillips*, 141 A.3d 512, 522 (Pa. Super. 2016) (some citations omitted and some formatting altered); *see also Commonwealth v. Wolfel*, 233 A.3d 784, 790 (Pa. 2020) (stating "the Commonwealth waived its challenge to Appellant's failure to raise a claim under Article I, Section 8, by failing to challenge the suppression court's explicit invocation of that provision before the Superior Court."); *Commonwealth v. Bishop*, 217 A.3d 833, 838-42 (Pa. 2019) (holding that defendant's claim that Article I, Section 9 of the Pennsylvania Constitution granted greater protection against self-incrimination than the Fifth Amendment to the United States Constitution was waived because defendant did not present this argument to the trial court or the Superior Court).

At the sentencing hearing, Appellant's counsel objected to the admission of the audio recording, stating:

> I have my objection that this audio recording was already suppressed at trial. I believe the grounds for suppression included my due process argument, discovery issues, the officer's inability to recall what was said, and the Commonwealth did not establish the proper consent or consent paperwork which still has not been produced to this day.

N.T. Sentencing Hr'g at 9. Appellant incorporated by reference his prior arguments from the suppression hearing, wherein he argued the recording should have been excluded because it was untimely produced by the Commonwealth and because it was obtained outside the thirty-day consent period under the Wiretap Act. *Id.*; *see also* N.T. Trial, 1/7/19, at 63-64, 83-84, 97-98. At the suppression hearing, Appellant, relying on *Commonwealth*

- 11 -

*v. Shreffler*, 201 A.3d 757 (Pa. Super. 2018), argued "[t]he Wiretap Act is to be strictly construed to protect individual privacy rights because it derogates a fundamental Pennsylvania Constitutional right to privacy". N.T. Trial, 1/7/19, at 97. At sentencing, the trial court asked Appellant if he had any authority to show that the recording was not admissible, he responded "I don't think there is any authority addressing this because I don't think it's done. I've never seen it done before where something gets suppressed and then gets brought up at sentencing." N.T. Sentencing Hr'g at 12. Appellant did not argue that Article I, Section 8 of the Pennsylvania Constitution prohibited the admission of the suppressed recording at sentencing. *Id.* at 9, 12.

> The trial court provided the following reasoning at sentencing:
>
> This case is distinguishable from the typical receiving stolen property case. [Appellant's] professional business aided, supported, and helped facilitate buying and selling of stolen property obtained from a residential burglary ring. [Appellant] knew he was buying stolen property. Over 1,000 items of stolen property, mainly jewelry, were recovered from his home and his three store fronts on jewelers' row in Philadelphia pursuant to lawfully issued search warrants.
>
> [Appellant's] words and interactions encouraged future buying of stolen property. In sum, unlike the run-of-the-mill receiving stolen property case, [Appellant's] criminal conduct was an intentional, regular, and integral part of his professional business activities and helped promote a series of home invasions and residential burglaries.
>
> The [trial c]ourt has reviewed the trial transcript, considered the presentence investigation report, including the sentencing guidelines, the parties' sentencing memos, the evidence presented at sentencing, and the arguments of counsel the evidence presented at sentencing, and the arguments of counsel.

*Id.* at 59-60.

Essentially, Appellant argues that because the June 17, 2016 audio recording had been suppressed at trial, Article I, Section 8 of the Pennsylvania Constitution prohibited its admission at sentencing. However, this argument is waived because he did not present that argument to the trial court. Further, even if Appellant had preserved his claim, he did not raise it in his Rule 1925(b) statement. Therefore, this claim is waived. *See* Pa.R.A.P. 1925(b); *Phillips*, 141 A.3d at 522; *see also Wolfel*, 233 A.3d at 790; *Bishop*, 217 A.3d at 838-42.

We note that even if Appellant's arguments under the Pennsylvania Constitution were not waived, he has failed to establish that the trial court violated exclusionary rule protections by admitting the suppressed audio recordings at his sentencing hearing. The record shows that the trial court reviewed the trial transcript, and other evidence which presented overwhelming evidence of Appellant's guilt, in addition to the PSI, sentencing guidelines, and arguments of counsel in imposing sentence. *See* N.T. Sentencing Hr'g at 59-60. Accordingly, no relief is due.

For the reasons herein, we affirm the trial court's judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 11/10/2020

COURT OF COMMON PLEAS OF MONTGOMERY COUNTY, PENNSYLVANIA
CRIMINAL DIVISION

| | | |
|---|---|---|
| **COMMONWEALTH OF PENNSYLVANIA** | : | **CP-46-CR-0007941-2017** |
| | : | **CP-46-CR-0001354-2017** |
| | : | |
| **v.** | : | **1423 EDA 2019** |
| | : | **1424 EDA 2019** |
| | : | |
| **WASIM SHAZAD** | : | |

**OPINION**

HAAZ, J.

July 23, 2019

## INTRODUCTION AND BACKGROUND

On April 5, 2019, Defendant was sentenced to an aggregate term of two to six years imprisonment with four years of consecutive probation and a fine of $47,500 following his convictions in a bench trial of four counts of receiving stolen property, two counts of conspiracy to receive stolen property and three counts of failure to maintain proper records of transactions. Defendant appeals from the judgment of sentence.

Defendant owned three stores in the Jewelers' Row section in Center City, Philadelphia: Vasim Jewelry at 83 S. 8th Street, Philadelphia Jewelry Tools & Supply Co. at 814 Chestnut Street, and V Jewelers at 735 Sansom Street. The Commonwealth alleged and proved that Defendant used these stores to act as a "fence" for members of a sophisticated burglary ring who perpetrated home invasions and stole high-end jewelry, watches, purses and other items in 2015 and 2016.

### i. The Jericho Road Burglary

On August 28, 2015, the residents of 1412 Jericho Road in Abington Township reported to Abington police that their home was burglarized. T4 196:14-16.[1] The homeowners told

---

[1] T1 = Trial Transcript of January 7, 2019

1

police that their back door had been kicked in and their jewelry stolen. T4 196:17-22. Shortly before the burglary, at about 8:30 a.m., a police officer had responded to a report of a suspicious vehicle near the home. Police responded to the reported burglary at approximately 9:39 a.m. that same morning. T4 185:18-24. Police later identified an individual named Ralph Mayrant as the owner and occupant of the suspicious vehicle parked near the burglarized home shortly before the burglary. T4 185:18-186:8.[2]

Detectives determined by reviewing Mayrant's phone records that he had blocked his caller ID to place calls to 1412 Jericho Road the evening before and the morning of the burglary. T4 198:21-25. Police also discovered sixteen calls between Mayrant and a woman named Kyalissa Ramseur the evening before the burglary. T4 199:2-7.

Investigators later determined that Kyalissa Ramseur is married to a man named Kebbie Ramseur. T2 33:16-19.[3] After retrieving Kebbie Ramseur's phone records, police found that he placed a call to the Defendant, Wasim Shazad, at 10:55 am on August 28, 2015, shortly after the time of the burglary. T5 8:2-7. Mayrant's cell phone traveled to the vicinity of Jeweler's Row in Philadephia shortly after the burglary of 1412 Jericho Road. T4 199:8-13.

---

T2 = Trial Transcript of January 8, 2019
T3 = Trial Transcript of January 9, 2019
T4 = Trial Transcript of January 10, 2019
T5 = Trial Transcript of January 11, 2019
T6 = Trial Transcript of January 14, 2019
T7 = Trial Transcript of January 15, 2019

[2] On December 5, 2017, Ralph Mayrant pleaded guilty to one count of criminal conspiracy to commit burglary under Bill of Information 1353-2017 and one count of criminal conspiracy to commit burglary under Bill of Information 6130-2016. On March 5, 2017, he was sentenced to an aggregate term of four to eight years of imprisonment.

[3] On December 6, 2017, Kebbie Ramseur was found guilty following a stipulated bench trial of corrupt organizations and six counts of criminal conspiracy to commit burglary under Bill of Information 1352-2017 and four counts of criminal conspiracy to commit burglary under Bill of Information 6381-2016. On March 5, 2018, he was sentenced to an aggregate term of ten to twenty years of imprisonment.

2

## ii.    The Audet Burglary

On October 30, 2015, Adele Audet's home, located at 119 St. Moritz Drive in Wilmington, Delaware, was burglarized. T3 138:15-23. A window into her kitchen had been smashed. T3 142:14-17. Audet was not home at the time of the burglary and received an alarm alert at about 11:30 p.m. that evening. T3 139:9-14. The burglars stole jewelry and a football autographed by Brett Favre. T3 144:6-11. Detective David DiNardo of the New Castle County Police Department spoke to Audet about the burglary. T1 182:3-20. Pursuant to his suggestion, Audet searched eBay and identified jewelry for sale that resembled her stolen property. T3 146:17-23.

Detective DiNardo determined that jewelry Audet identified as stolen was being sold by KNA Jewelers located on Jeweler's Row in Philadelphia. T1 186:7-12. Detective DiNardo proceeded to Jewelers' Row and interviewed KNA's owner, Nir Hoter, on November 9, 2015. T1 189:3-6. Hoter produced two watches with serial numbers matching those reported stolen by Audet. T1 186:17-25. A third watch Audet identified had already been sold to another dealer. DiNardo retrieved this watch from the other dealer and confirmed that its serial number also matched the watch stolen from Audet. T1 188:4-6; 189:12-14.

Hoter, the owner of KNA, provided DiNardo with a copy of a receipt showing that Audet's watches were sold to him by Defendant Shazad on Sunday, November 1, 2015, just two days after the Audet burglary. T1 192: 5-15. DiNardo recovered surveillance footage from Hoter which showed Shazad selling Audet's stolen watches to Hoter on November 1, 2015 at Hoter's store on Jeweler's Row. T1 197:13-16; 201:9-202:24; Ex. C-3. Hoter gave Shazad a receipt for the stolen watches he bought from Defendant. Ex. C-21. Cell phone records showed a total of seventeen calls between Defendant Shazad and Kebbie Ramseur on October 31, 2015,

3

the day after the Audet burglary and the day before Shazad sold Audet's stolen watches to Hoter. T5 10:13-19. Audet identified a football signed by Brett Favre which was recovered during a search of Ramseur's home as the same one stolen from her home. T2 50: 12-17; T3 145: 17-24.

### iii. Surveillance of Defendant's Stores

Detective DiNardo investigated a string of robberies similar to the Audet burglary. One similar burglary occurred at 16 Summit Lane, Wilmington, DE on April 1, 2016. T2 34:13-23. During that burglary, the perpetrators entered the home between 9:45 and 10 p.m. by breaking a second floor skylight using a rock in a tarp and climbing up a ladder. T2 35:2-10. Detectives concluded that the burglars were sophisticated because they avoided setting off any alarms until their exit, in part by crawling on floors to avoid motion sensors which left glove impressions. T2 35:11-23. A glove seized from Ramseur's home pursuant to a legally executed search matched the glove impressions left at 16 Summit Lane. T2 39:17-19; 51:5-11.

DiNardo conducted surveillance on Shazad's stores on the Sunday following the burglary at 16 Summit Lane. T2 40:5-9. Defendant Shazad appeared at his store around 1:30 p.m. that Sunday. T2 40:14; 41:2-4. Most of the other stores on Jewelers' Row were closed at that time. T2 44:5-10. DiNardo observed two men step out from another car, which was registered to Kyalissa Ramseur. He identified Kebbie Ramseur and Ralph Mayrant as the two men. T2 41:22-24; 42:21-25; 43:2-10. Both Ramseur and Mayrant appeared to notice the police presence and never went into Defendant Shazad's store. T2 42:10-20; 22-24. Defendant Shazad closed his store shortly thereafter. T2 43:13-21. Phone records showed calls between Ramseur and Shazad that same day. T5 26:25-27:4.

4

### iv. The Drebin Burglary

Jeffrey Drebin testified that on April 19, 2016 his home at 1121 Barberry Road in Bryn Mawr was burglarized. T2 140:4-13. It appeared to him that the burglars had entered through his second floor porch. T2 140:17-21. Drebin testified that his home had no motion sensors on the second floor. *Id.* Among the property he reported stolen were three watches, a TAG Heuer watch he owned, a TAG Heuer watch he bought for his son, and a Cyma watch owned by his wife. T2 142:8-19.

Drebin testified that the TAG Heuer watch he purchased for his son cost approximately $1,200 and is currently valued at $1,500. T2 142:20-23. He valued his TAG Heuer watch as worth approximately $1,000. He purchased his wife's Cyma watch for $2,500 or $3,000. T2 142:24-143:10.

On May 24, 2016, during a burglary investigation in Cherry Hill, NJ, police stopped a car with Ralph Mayrant and Shron Linder inside.[4] In plain view within the vehicle was a TAG Heuer watch that was seized and turned over to the Lower Merion Police Department. T2 6:6-7:13. Another TAG Heuer watch was recovered by Lower Merion police during a search of Defendant's home. T2 198:7-17; T3 182:10-18; 185:3-21. Drebin subsequently identified both of these TAG Heuer watches as the ones stolen from his home. His wife identified, then claimed the two TAG Heuer watches and the Cyma watch from the Lower Merion Police Department, the Cyma watch having been seized from Defendant's store at 814 Chestnut Street. T2 146:5-13; 153:14-22. The serial numbers for both TAG Heuer watches were verified as matching those stolen from the Drebin home. T2 150:2-7; T4 83:4-25.

---

[4] On December 6, 2017, Shron Linder was found guilty following a stipulated bench trial of attempted burglary and criminal conspiracy to commit burglary under Bill of Information 6389-2016 and of corrupt organizations and five counts of criminal conspiracy to commit burglary under bill of Information 1350-2017. On March 5, 2018, he was sentenced to an aggregate term of eight and one-half to seventeen years of imprisonment.

5

## v.    Detective Scott's Undercover Operation

Officer James Scott of the Philadelphia Police Department was assigned to investigate a fencing operation on Jewler's Row. T2 at 219:21-220:5. Acting in an undercover capacity, Scott went to Defendant's store at 83 S. 8th Street On April 15, 2016 with jewelry he wanted to sell to Shazad. T2 222: 15-16; 224: 12-15. Referring to the jewelry, Scott told the Defendant that "the boys got it for me" and Shazad should "get rid of it quick." T2 233: 6-7; 23-25. Scott made an audio recording of this interaction with Shazad. Ex. C-358.

Scott asked Defendant to pay $3,000 for the jewelry. Shazad gave Scott $1,700 and instructed him to go to another one of Defendant's stores at 814 Chestnut Street where he would receive the rest of the money. T2 335:19-24. Scott walked to 814 Chestnut Street and Shazad came in ten minutes later. T2 236:5-13. Scott and Shazad left the store and walked in different directions. T5 51:5-28; 53:16-18. Shazad walked into a store he did not own, Center City Metals, for about ten minutes and then walked back to 814 Chestnut Street. T4 188:14-22. Scott testified that Defendant paid him the remaining $1,300 at the 814 Chestnut Street location. T2 237:9-11. He also testified that at no time did Defendant ever ask for his name or identification. T2 237:12-27.

Officer Scott testified that he recorded a second encounter with Defendant on April 22, 2016. T2 239:14-17; 240:5-6; Ex. C-359. Officer Scott first went to Defendant's store at 83 S. 8th Street to sell Shazad watches. T2 243:8-11. Both Scott and Defendant then walked to Defendant's store at 814 Chestnut Street, where Defendant offered $2,500 for the watches. T3 15:4; 19:9-10. While there, Scott told Defendant that he took the watches from someone's house

6

while they were at work. T3 30:20-31:3. Defendant then instructed Scott to go back to 83 S. 8th Street for the money. T3 20:3-5.

After leaving 814 Chestnut Street, Scott observed Defendant go into another store on Chestnut Street, then down the 700 block of Sansom Street, before walking back up to 83 S. 8th Street. When Defendant returned, he no longer had the watches Scott gave him. T3 21:3-16. Another officer observed Defendant go into KNA Jewelers and then a store on Sansom Street before returning to 83 S. 8th Street. T4 106:6-16. Scott and Defendant met back at 83 S. 8th Street, where Shazad paid Scott for the watches. T3 21:17-18; 22:12-15. Defendant never asked for any identifying information from Scott.[5] T3 35:16-24.

Officer Scott testified that he recorded a third encounter with Defendant in his store at 83 S. 8th Street on May 4, 2016. T3 35:25-36:4; 37:16-21; Ex. C-360. During this visit, Scott told Defendant that the jewelry he brought should be melted because "it is hot." T3 42:2-4. Defendant paid Scott $2,000 for the jewelry. T3 43:10-16. Scott testified that Defendant never asked for his name or identification during this exchange. T3 43:17-25.

Officer Scott had two more interactions with Defendant on June 16, 2016 and June 17, 2016. The first of these was a phone call setting up a meeting and the second was a meeting very similar in nature to his three previous encounters. However, all evidence of these interactions was either precluded or stricken from the record and was not considered at trial. Evidence of the June 17, 2016 interaction was considered only for the purpose of sentencing to the extent discussed in the sentencing section of this opinion.

---

[5] 73 P.S. § 1933(a) provides, in pertinent part:

Every dealer in precious metals shall keep a record of every transaction upon a form approved by the Attorney General. The record shall include as a minimum:
    (1) The name, age and address of the seller which must be verified by said dealer, requiring proof of identity from the seller sufficient to insure the accuracy of the represented name and address of the seller.

7

### vi. Carter-Braswell Burglary Ring

Lieutenant Steven Fink of the Abington Police Department testified that Abington police arrested Dominic Carter and Jesse Braswell, members of a burglary ring unrelated to the Ramseur, Mayrant, Linder and Jaynes burglary ring.[6] T4 200:9-12. Carter's phone records showed that he would travel to Jewelers' Row after burglaries and call Defendant's cell phone. T4 205:2-14; 206:6-12.

Dominic Carter pleaded guilty to burglary charges and Jesse Braswell pleaded guilty to conspiracy related to some of those charges.[7] T6 113:9-16. Braswell served as the lookout for Dominic Carter in connection with the burglaries they committed. T6 115:4-18. After the burglaries, Braswell went with Carter to sell the stolen jewelry to Defendant on Jewelers' Row on at least ten occasions. T6 127:11-15. Braswell testified that Defendant asked Carter "who did you fuck today?" T6 128:11-16. Defendant then bought the stolen jewelry from Carter. T6 120:20-121:2. At no point did Defendant ask for the names or identifications of Braswell or Carter. T6 122:2-11.

### vii. Seizure of Items and Return to Owners

On January 20, 2017, search warrants were executed at Defendant's home at 3117 Hannah Avenue in East Norriton Township, Montgomery County, and his three store locations at 83 South 8th Street, 814 Chestnut Street and 735 Sansom Street in Philadelphia. The

---

[6] On December 6, 2017, Jarrel Jaynes was found guilty following a stipulated bench trial of four counts of burglary and one count of robbery under Bill of Information 1351-2017 and one count of attempted burglary under Bill of Information 6380-2016. On March 6, 2018, he was sentenced to an aggregate term of ten to twenty years of imprisonment.

[7] On November 17, 2016, Dominic Carter pleaded guilty to thirty-one counts of burglary under Bill of Information 2933-2016. He was sentenced to an aggregate term of fifteen to forty years of imprisonment.

On September 8, 2017, Jesse Braswell pleaded guilty to six counts of conspiracy to commit burglary under Bill of Information 2099-2016. On February 7, 2019, he was sentenced to an aggregate term of eleven and one-half to twenty-three months imprisonment with five years of consecutive probation.

8

Montgomery County District Attorney's Office seized jewelry and watches from Defendant's home and the entire inventory of Defendant's three stores amounting to approximately 50,000 pieces of jewelry. T5 103:23-104:5. The District Attorney's Office then created a website and displayed the seized items for viewing by the general public. People who had previously reported burglaries to police were invited to review the website and claim any items that they believed to be theirs. T1 104:24-105:4. If claimed items matched the description of stolen items contained in their police report, the items were returned. *Id.* Approximately 1,279 stolen items were returned to burglary victims in this fashion. Some small number of people later returned those items back to the District Attorney's Office after they realized that the items were not actually theirs despite initial impressions. T4 118:5-13. All items not identified as stolen were returned to Defendant.

### viii. Defendant's Statement to Detective Konieczny

Detective Christine Konieczny of the Lower Merion Police Department testified that in August of 2017, she interacted with Defendant regarding the return of property not claimed as stolen. T2 189:6-10. Defendant told her that "he wasn't the only one buying stolen items, and that he had learned his lesson . . . [H]e was wondering [if] he could pay a fine in lieu of jail time. And he said he didn't do anything wrong, the guys that did those things should be the ones going to prison." T2 190:5-11.

### ix. Issues on Appeal

A non-jury trial commenced on January 7, 2019. On January 18, 2019, the court found Defendant guilty of counts seven, eight, and nine (receiving stolen property graded as misdemeanors of the third degree);[8] counts ten, eleven, and twelve (records offenses under the

---

[8] 18 Pa.C.S. § 3925

9

Precious Metals Act graded as misdemeanors of the third degree);[9] count seventeen (conspiracy to receive stolen property graded as a misdemeanor of the third degree);[10] and count eighteen (conspiracy to receive stolen property graded as a felony of the third degree) under Bill of Information 1354-2017. Defendant was acquitted of counts one through six, charging two counts of corrupt organizations and four counts of dealing in unlawful proceeds with the intent to promote unlawful activity, counts thirteen through sixteen, involving conspiracy to deal in unlawful proceeds with the intent to promote unlawful activity, and counts nineteen through twenty-one, involving conspiracy to receive stolen property and conspiracy to engage in a corrupt organization. Under Bill of Information 7941-2017, Defendant was convicted of count one (receiving stolen property graded as a felony of the third degree). Defendant was acquitted of counts two through twenty-two charging seven counts of receiving stolen property, ten counts of improperly maintaining records of transactions in precious metals, and four counts of dealing in unlawful proceeds with the intent to promote unlawful activity.

Defendant was sentenced on April 9, 2019. On May 7, 2019, defendant filed two separate notices of appeal. That same day the court ordered Defendant to file a concise statement of matters complained of on appeal within 21 days. On May 28, 2019, Defendant filed the following concise statement of matters complained of on appeal:

1. The Trial Court committed an error of law and abuse of discretion in denying Defendant's Motion for Change of Venue, when the proper jurisdiction to bring charges against the Defendant was in Philadelphia County. The Defendant's due process rights were violated because the Commonwealth was unable to demonstrate that the Defendant engaged in any criminal activity in Montgomery County.

[9] 73 P.S. § 1933

[10] 18 Pa.C.S. § 903(a)(1)

10

2. The Trial Court committed an error of law and abuse of discretion in denying Defendant's Motion to Suppress Search Warrants, executed at his residence and business locations, as the search warrants were defective on their face for (i) not containing sufficient probable cause, (ii) being overly broad and (iii) containing stale information.

3. The Trial Court committed an error of law and abuse of discretion in admitting prior bad acts pursuant to Pennsylvania Rule of Evidence 404(b) as the Commonwealth failed to show how the prior bad acts were admissibly pursuant to the exceptions enumerated in 404(b); in addition the probative value of the prior bad acts, if any, was substantially outweighed by their prejudicial effect.

4. The Trial Court committed an error of law and abuse of discretion in allowing Officer James Scott to testify from his independent recollection of the June 17, 2016 conversation with the Defendant. Part of the conversation was based upon an illegally recorded conversation on June 16, 2016 in violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S. § 5701 *et seq.*, which the Court had properly suppressed.

5. The Trial Court committed an error of law and abuse of discretion in admitting evidence of an audio recording of the Defendant at his Sentencing Hearing that the Court previously suppressed pre-trial as being obtained in violation of the Pennsylvania Wiretapping and Electronic Surveillance Control Act, 18 Pa.C.S. § 5701 *et seq.* The Defendant was unfairly prejudiced at his Sentencing Hearing by the introduction of inflammatory, inadmissible and illegally recorded evidence.

6. The Trial Court committed an error of law and abuse of discretion in sentencing the Defendant to an aggregate sentence of 24 to 72 months which was in the aggravated sentencing range for both of the Felony Three Conspiracy to Receiving Stolen Property Charges; the guidelines for both carried a standard range sentence of RS-9. In addition, the Court imposed maximum fines on each of the convictions against the Defendant which resulted in an unduly harsh and excessive sentence.

## LEGAL ANALYSIS

### 1. Venue Was Proper in Montgomery County

"All criminal proceedings in summary and court cases shall be brought before the issuing authority for the magisterial district in which the offense is alleged to have occurred[.]" Pa.R.Crim.P. 130(A). "When charges arising from the same criminal episode occur in more than

11

one judicial district, the criminal proceeding on all the charges may be brought before one issuing authority in a magisterial district within any of the judicial districts in which the charges arising from the same criminal episode occurred." Pa.R.Crim.P. 130(A)(3). Moreover, "[a] prosecution for criminal conspiracy may be brought in any county where the unlawful combination was formed, or in any county where an overt act was committed by any of the conspirators in furtherance of the unlawful combination." *Commonwealth v. Fithian*, 961 A.2d 66, 78 (Pa. 2008); *see also Commonwealth v. Brookins*, 10 A.3d 1251, 1259 (Pa. Super. 2010) (holding for venue purposes that the court "cannot conclude that none of [Defendant's] offenses occurred in Montgomery County" after appellant was convicted of conspiracy offenses involving conduct by co-conspirators in Montgomery County).

Change of venue motions are addressed to sound discretion of trial court and are reviewable on an abuse of discretion standard. *Commonwealth v. Boring*, 684 A.2d 561, 453 (Pa. Super.), *appeal denied*, 689 A.2d 230 (Pa. 1996). In the instant matter, Defendant filed an omnibus pre-trial motion that included a request for a change of venue. The trial court (Page, J.) held an evidentiary hearing on September 11, 2017. The court found that the Commonwealth had met its burden that venue was proper in Montgomery County and denied Defendant's motion. N.T. Venue Hearing, 9/7/17, at 50:11-16.

The record in this case contains ample support for the court's finding that venue was proper in Montgomery County. The affidavits of probable cause supporting the complaints alleged that Kebbie Ramseur and other burglars burglarized several homes in Montgomery County, including 1412 Jericho Road in Abington Township, 705 Cedar Lane in Lower Merion Township, 1121 Barberry Road in Lower Merion Township, 6024 Sheaf Lane in Whitemarsh Township and 6015 Sheaf Lane in Whitemarsh Township. The affidavits alleged that Shazad

12

conspired with these burglars and acted as a fence so that they could quickly sell the stolen property and profit from their criminal enterprise while avoiding detection. Some of the stolen property was recovered in Shazad's Montgomery County home located at 3117 Hannah Avenue, East Norriton, Pennsylvania. This activity was all part of a criminal episode that spanned multiple counties. Among these counties was Montgomery County, making it an appropriate venue. "Generally, charges against a defendant are clearly related in time and require little analysis to determine that a single criminal episode exists. *However, in defining what acts constitute a single criminal episode, not only is the temporal sequence of events important, but also the logical relationship between the acts must be considered.*" *Commonwealth v. Reid*, 77 A.3d 579, 585 (Pa. 2013) (emphasis in original) (quoting *Commonwealth v. Hude*, 458 A.2d 177, 181 (Pa. 1983)).

Although the court heard evidence from Defendant's wife suggesting that one or more potential witnesses who lived in Philadelphia were unwilling to travel to Montgomery County to act as witnesses, the court did not find that this warranted a transfer of venue based on the proximity of those witnesses, particularly in light of the court's ability to order their appearance if necessary. N.T. Venue Hearing, 9/7/17, at 50:2-10. When venue is proper under Pa.R.Crim.P. 130, it may nonetheless be transferred if "it is determined after hearing that a fair and impartial trial cannot otherwise be had in the county where the case is currently pending." Pa.R.Crim.P. 584. "[A] change of venue becomes necessary when a fair and impartial jury cannot be selected." *Commonwealth v. Stevens*, 670 A.2d 623, 625 (Pa. 1996). There was no argument or evidence presented to suggest that such a jury could not be selected or that the potential jury pool had been tainted by pre-trial publicity. Accordingly, venue in Montgomery

13

County was proper. *See Commonwealth v. Mulholland*, 702 A.2d 1027 (Pa.1997) (venue in a criminal action properly belongs in the place where the crime occurred).

## 2. Defendant's Motion to Suppress the Evidence Seized from His Home and Business Locations Was Properly Denied

The parties agreed to a stipulation of facts for the purpose of Defendant's Motion to Suppress and each side submitted a supporting memorandum of law. The court's decision regarding Defendant's Motion to Suppress was based on the stipulation and written submissions of the parties.

Lower Merion and Philadelphia police applied for the issuance of search warrants on January 19, 2017 to seize allegedly stolen property from Shazad's home located at 3117 Hannah Avenue in East Norriton and his businesses located at 83 South 8th Street, 814 Chestnut Street, and 735 Sansom Street in Philadelphia. That same day the Honorable Diana Anhalt (Philadelphia Court of Common Pleas) approved the issuance of the warrants for the Philadelphia locations and the Honorable Henry Shireson (MDJ Lower Merion) approved the issuance of the warrant for Defendant's home in Montgomery County. The search warrants were executed on January 20, 2017. On July 5, 2017, Defendant filed a motion to suppress evidence seized as a result of the search warrants. Defendant alleged that the warrants and subsequent searches were defective for (i) not containing sufficient probable cause; (ii) being overly broad; and (iii) containing stale information.

14

### (i) The Affidavit Contained Sufficient Probable Cause[11]

The sufficiency of probable cause affidavits is reviewed pursuant to the following well-settled principles:

> Before an issuing authority may issue a constitutionally valid search warrant, he or she must be furnished with information sufficient to persuade a reasonable person that probable cause exists to conduct a search. The standard for evaluating a search warrant is a "totality of the circumstances" test as set forth in *Illinois v. Gates*, 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983), and adopted in *Commonwealth v. Gray*, 503 A.2d 921 (1985). A magistrate is to make a "practical, common sense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found in a particular place." The information offered to establish probable cause must be viewed in a common sense, nontechnical manner. Probable cause is based on a finding of the probability, not a *prima facie* showing of criminal activity, and deference is to be accorded a magistrate's finding of probable cause.
>
> [*Commonwealth v. Manuel*, 194 A.3d 1076, 1081 (Pa. Super. 2018) (quoting *Commonwealth v. Rapak*, 138 A.3d 666, 670-71 (Pa. Super. 2016)).]

The affidavit of probable cause supporting the warrants to search Defendant's home, located at 3117 Hannah Avenue in East Norriton, Pennsylvania, and Defendant's three stores in Philadelphia contained sufficient probable cause.[12] The affidavit provides a detailed description of the background and experience of the affiant, Sgt. Steven Fink. The affidavit then delineates a

---

[11] The general argument regarding whether the affidavit of probable cause, facially, failed to set forth sufficient facts establishing probable cause for some or all of the subject search warrants was not argued before this court (though it was cursorily and casually asserted in paragraph 31 of Defendant's omnibus pre-trial motion). Defendant did argue that the information was stale, which is addressed *infra*. "It is well settled that issues not raised before the trial court cannot be advanced for the first time on appeal." *Commonwealth v. Miller*, 80 A.3d 806, 811 (Pa. Super. 2013) (citing Pa.R.A.P. 302(a)); *see also Commonwealth v. Hawkins*, 441 A.2d 1308, 1312 n.6 (Pa. Super. 1982) (stating that even issues of constitutional dimension cannot be raised for the first time on appeal). However, the court will address the merits of this claim should the Superior Court find that it has been properly preserved for review.

[12] The affidavits of probable cause supporting the subject search warrants were the same in all material respects. Accordingly, the court will simply refer to "the affidavit of probable cause" or "the affidavit" when discussing any or all of the supporting affidavits.

series of burglaries conducted by Ralph Mayrant, Kebbie Ramseur, Shron Linder and Jarrel Jaynes. These burglaries were linked through the use of cell phone call records between the burglars during and around the time of the burglaries as well as cell-site location information placing the burglars at or near the site of the burglaries during or around the time of the burglaries. Cell phone records show approximately 175 calls between Defendant and Ramseur between August 2015 and August 2016, many within one or two days of a burglary suspected to have been committed by Ramsuer, Mayrant, Linder or Jaynes. There were 37 calls between Defendant and Mayrant between October 2015 and January 2016 as well as two calls between Defendant and Jaynes in June 2016.

The affidavit sets forth that police used cell-site location information and phone records to establish patterns of activity before and after the burglaries that linked the burglaries with Defendant. Specifically, on October 31, 2015, the day after the burglary of Adele Audet's residence at 119 St. Moritz Drive, Kebbie Ramseur's cell phone used cell site towers in the area of Jeweler's Row. On November 7, 2015, Ms. Audet discovered several of the watches stolen from her home being sold on Ebay. The sellers were identified as two Jewlers' Row stores, K.N.A. Jewelers and Sansom Watches. When Detective Dinardo spoke to the owner of K.N.A. Jewelers, Nir Hoter, Mr. Hoter provided two of the subject watches, which Detective Dinardo confirmed belonged to Ms. Audet. Mr. Hoter said that he sold a third watch to Sansom Watches, which, when recovered, was also confirmed as stolen. Mr. Hoter provided a receipt stating that he purchased the three watches from "Wasim" on November 1, 2015. Mr. Hoter provided surveillance video that showed Defendant at K.N.A. Jewelers on November 1, 2015 selling watches to Mr. Hoter, at least one of which could be visually confirmed to be one of the stolen watches. Defendant's cell phone records show that while he was at K.N.A. Jewelers conducting

16

this transaction he made a phone call to Kebbie Ramseur. Mr. Hoter told police that it sounded like Defendant was brokering a deal on the phone.

New Castle County detectives also directly observed Ramseur visit one of Defendant's stores on April 3, 2016. However, Ramseur did not enter the store, apparently spotting detectives observing him and then turning around to return to his vehicle.

The affidavit describes substantial evidence that Defendant acted as a fence in a prior unrelated matter involving serial burglar Dominic Carter. The affiant was also involved in that investigation. This evidence included statements of Carter's co-defendant who was able to pick Defendant out of a photo-array lineup as being Carter's regular fence.

In December 2015, Citizens Bank filed a report stating that Defendant "structured separate transactions over a short period of time," and "made concerted efforts to evade federal reporting requirements." Such suspicious transactions included depositing checks issued by Center City Metals, LLC.[13] From April 2015 to April 2016, three local Pennsylvania casinos reported more than $400,000 of suspicious transactions by Defendant involving "minimal gaming with large transactions," "suspicious intra-casino funds transfers," "suspicious use of counter checks or markers," and "structuring chip redemption." The affiant stated that such methods are commonly employed in money-laundering schemes.

On April 15, 2016, April 22, 2016 and May 4, 2016, Philadelphia District Attorney's Office detectives, in collaboration with Montgomery County detectives and detectives from New Castle County, Delaware, conducted an undercover operation at Defendant's 8th Street store. The undercover Philadelphia detective sold Defendant thousands of dollars in watches and gold jewelry. The detective strongly implied that the watches and jewelry were stolen, even saying to Defendant "melt it, it's hot," referring to the gold jewelry. Defendant purchased the items and

---

[13] A reasonable inference can be made that Defendant was probably reselling precious metals from stolen jewelry.

17

did not take any of the necessary information in order to create the legally required records of these transactions. Defendant did not contact law enforcement about these purchases.

On June 20, 2016, the Philadelphia Court of Common Pleas approved warrants allowing the installation of mobile tracking devices on Ralph Mayrant's 2008 Chrysler Town and Country Minivan and Kebbie Ramseur's 2008 Honda Pilot. These trackers were installed on July 1, 2016. Additionally, on June 22, 2016, Detective Dinardo initiated a "live ping" of Ramseur's cell phone. Using these techniques detectives tracked Ramseur meeting with Defendant in one of his Jewelers' Row stores on June 22, 2016, June 29, 2016, July 2, 2016 and July 5, 2016. On July 17, 2016, Ramseur's phone pinged in the area of a burglary that occurred at 6015 Sheaf Lane in Montgomery County. The next day Ramseur's phone again pinged in the area of Jewelers' Row.

Many of Defendant's interactions with Ramseur, Mayrant, Linder and Jaynes occurred though their cell phones. Detective Fink stated in the affidavit that in his experience co-conspirators in burglary and fencing operations often store information related to these illegal activities, including banking records and records of transactions, electronically, including on their cell phones and laptops. He further stated they often keep their cell phones and laptops at their residences. It is also common to keep proceeds of such activity, like jewelry and watches, for themselves and to store such proceeds at their residences. This made it probable that cell phones, laptops and stolen goods evidencing criminal activity would be found at Defendant's residence.

The affidavit of probable cause was sufficient to support the issuance of the search warrants. Defendant is known to have been a fence is a prior unrelated burglary ring. Cell-site location information places Ramseur, Mayrant, Linder and Jaynes at or near the location of a

18

string of burglaries in the tristate area. Cell-phone call records show numerous calls between Defendant and the burglars near the times of the burglaries. Ramseur is then repeatedly tracked and observed visiting Defendant's stores on Jewelers' Row soon after the dates of some of the burglaries. None of these transactions are recorded despite the legal requirement that Defendant keep such records. Defendant then engages in substantial suspicious activity consistent with re-selling stolen property and laundering the proceeds of those sales. Considered in its totality, this evidence made it probable that Defendant was engaged in criminal activity and that evidence of that activity would likely be found at his home and businesses. "Probable cause exists when the facts and circumstances set forth in the affidavit are sufficient to warrant a man of reasonable caution in the belief that the contraband to be seized was in the specified place." *Commonwealth v. Macolino*, 485 A.2d 1134, 1136 (Pa. Super. 1984) (quoting *Commonwealth v. Frye*, 363 A.2d 1201, 1203 (Pa. Super. 1976)).

### (ii) The Search Warrants For Defendant's Stores and Seizure of Items Therein Were Not Overly Broad

Pursuant to Pa.R.Crim.P 205(2), a search warrant is required to "identify specifically the property to be seized." However, when an exact description of the property is impossible due to the nature of the activity, the search warrant is only required to name the general class of items sought. *Commonwealth v. Matthews*, 285 A.2d 510, 514 (Pa. 1971). The items to be seized need only be "as precisely identified as the nature of the activity permits." *Ibid.* "[W]hen an exact description of a particular item is not possible, a generic description may suffice." *Commonwealth v. Barba*, 460 A.2d 1103, 1111 (Pa. Super. 1983).

In *Barba*, appellant was arrested and charged with theft by receiving stolen property after the police executed several search warrants at appellant's home and other commercial buildings. 460 A.2d at 1104. Police found four commercial and residential buildings filled with air

19

conditioners, televisions, stereo sets, tires, appliances, clothing, jewelry and other items. Some of the merchandise was identified as stolen through serial numbers, but the serial numbers had been removed from other merchandise. Police confiscated and removed four truckloads of goods. *Id.* One of the warrants described the items being sought as:

> "Firearms, tires, stereo equipment, jewelry, new clothing, tools, radios, TVs, typewriters, stenotypers, car radios, CBs, air conditioners, cameras, lens, projectors, motors, currency, both paper and coin, and other items believed to be stolen."

[*Id.* at 1107.]

Barba appealed and claimed the general descriptions of the items to be seized were insufficient and the seizure was overly broad. The Superior Court held that the search warrants were sufficiently particular. *Id.* at 1109. The court noted that officers "had neither opportunity nor authority to examine all observed items for brand names, serial numbers, identifying marks, or other details sufficient to permit precise descriptions." *Id.* at 1107.

The descriptions of the items sought in the instant case were as particular as in *Barba*. Here, the affidavit included, in relevant part, under "Property to be Searched for and Siezed," which was incorporated in the search warrants by reference: "All identifiable jewelry meaning anything sufficiently unique, engraved, or having a serial number as part of illegal proceeds." Police seized 50,000 pieces of jewelry and other valuables, including all inventory in all three of Defendant's stores. (Suppression Stipulation ¶ 3). It was ultimately determined that only 1,279 of these items were stolen property. (Suppression Stipulation ¶ 7).[14] Because they faced the same types of limitations as the police in *Barba*, police here were "only required to describe the general class of the item [they were] seeking." *Barba*, 460 A.2d at 1107 (quoting *United States*

---

[14] This determination was made subsequent to the seizure when Montgomery County District Attorney's Office created a website, displayed pictures of all of the seized jewelry, and allowed people to claim the property if they had previously reported a burglary to police and the claimed items matched the description of stolen items in their police report. T5 104:24-105:4.

20

*v. Ventresca*, 380 U.S. 102, 85 S.Ct. 741, 13 L.Ed.2d 684 (1965)). "Fourth Amendment requirements do not impose a burden on the executing officer beyond his power to meet." *Id.* at 1108 (quoting *United States v. Scharfman*, 448 F.2d 1352 (2d Cir. 1971)).

Additionally, the appropriate remedy for items that are improperly seized is suppression. *Commonwealth v. Bosurgi*, 190 A.2d 304, 309 (Pa. 1963). "If a search is performed, 'within permissible limits, the improper seizure of particular articles does not taint the search or the seizure of proper articles. Only those items improperly seized, or their poisoned fruit, are suppressible, since they are the only items with respect to which the defendants' Fourth Amendment rights were violated.'" *Commonwealth v. Stewart*, 495 A.2d 584, 589 (Pa. Super. 1985) (quoting *Commonwealth v. Jones*, 323 A.2d 879, 884 (1974)). Where an otherwise valid search warrant is executed by police officers who make an overly broad seizure, "police may not now make evidentiary use of articles improperly seized, [but] they may still introduce into evidence those things found on the premises that were legally seized." *Jones, supra*, 323 A.2d at 884. The items from Defendant's store that were introduced at trial were legally seized as "identifiable jewelry meaning anything sufficiently unique, engraved, or having a serial number as part of illegal proceeds."

### (iii) The Information in the Affidavit of Probable Cause Was Not Stale

Defendant claimed the information in the affidavit of probable cause was stale and that the affidavit did not supply sufficient information for a finding that any of the jewelry that Defendant may have purchased knowing that it was stolen or believing that it was probably stolen, or any evidence of this illegal activity, was still remaining in his home or places of business.

21

Stale information cannot provide probable cause in support of a warrant. *Commonwealth v. Janda*, 14 A.3d 147, 158 (Pa. Super. 2011). The search warrants were not executed until January 2017. The most recent information in the affidavit of probable was identified in August 2016. This included phone records and cell-site location information from the summer of 2016 as well as information gleaned from Officer Scott's undercover operation and observations of Defendant's businesses by Officer Scott and other officers. Age alone is not determinative of staleness:

> [A]ge of the information supporting a warrant application is a factor in determining probable cause. If too old, the information is stale, and probable cause may no longer exist. Age alone, however, does not determine staleness. The determination of probable cause is not merely an exercise in counting the days or even months between the facts relied on and the issuance of the warrant. Rather, we must also examine the nature of the crime and the type of evidence.
>
> [*Id.* at 158-59 (quoting *Commonwealth v. Gomolekoff,* 910 A.2d 710, 713 (Pa.Super.2006)).]

"A showing that the criminal activity is likely to have continued up to the time of issuance of the warrant will render otherwise stale information viable." *Commonwealth v. Dennis*, 618 A.2d 972, 981 (Pa. Super. 1992) (quoting *Commonwealth v. Stamps*, 427 A.2d 141, 144 (Pa. 1981)).

The conduct alleged in this case was not a single isolated incident. Instead, it was an ongoing course of conduct in which defendant is alleged to having knowingly purchased burgled goods over an extended period of time. This diminishes the risk of staleness. *See Commonwealth v. Vergotz*, 616 A.2d 1379, 1382-83 (Pa. Super. 1992). This was criminal activity that was likely to have continued up to the time that the warrant was issued and some evidence of the criminal activity was likely to remain. The totality of the evidence supports the contention that Defendant was involved in an ongoing business of buying and selling stolen

22

jewelry. This was established through his past relationships with admitted burglars, financial records, cell phone records, undercover operations, and observations by law enforcement. It was also probable that proceeds from these activities and electronically stored records of transactions evidencing the activity could still be found in Defendant's home and places of business. Therefore, the court properly found that the information in the search warrants was not stale and was current enough to be properly relied upon.

### 3. Prior Bad Act Evidence

The Commonwealth filed a notice to introduce other acts evidence pursuant to Pa.R.E. 404(b) on December 21, 2018. The Commonwealth sought to introduce the consensual recordings and testimony of Officer Scott and the testimony of Jesse Braswell as evidence of a intent, knowledge and the absence of mistake regarding Defendant's receipt of stolen property. On January 6, 2019, Defendant filed a motion to preclude the recordings created by Officer Scott on June 16, 2016 and June 17, 2016. Defendant filed a brief in opposition to the Commonwealth's notice to admit prior bad acts evidence on January 7, 2019. On January 7, 2019, following oral argument, the court ruled that the June 16 and June 17, 2016 recordings were inadmissible pursuant to 18 Pa.C.S. § 5704. T1 101:2-6. In light of this ruling, the Commonwealth stated that the portion of its prior bad acts motion related to Officer Scott had been resolved and only that portion which related to the testimony of Jesse Braswell remained. T1 148:20-149:3. The court ruled that Braswell was permitted to testify regarding his encounters with Defendant relating to the sale of stolen goods. T1 155:23-156:6.

Pa.R.E. 404(b)(1) provides that "[e]vidence of a crime, wrong, or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character." "Evidence of prior crimes is not admissible for the sole

23

purpose of demonstrating a criminal defendant's propensity to commit crimes." *Commonwealth v. Melendez-Rodriguez*, 856 A.2d 1278, 1283 (Pa.Super. 2004). However, "[t]his evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Pa.R.E. 404(b)(2). Such evidence is admissible in a criminal case "only if the probative value of the evidence outweighs its potential for unfair prejudice." *Id.* " 'Unfair prejudice' means a tendency to suggest decision on an improper basis or to divert the jury's attention away from its duty of weighing the evidence impartially." *Commonwealth v. Dillon*, 925 A.2d 131, 141 (Pa. 2007) (quoting Pa.R.E. 403 comment). "Evidence will not be prohibited merely because it is harmful to the defendant. [The Supreme Court] has stated that it is not required to sanitize the trial to eliminate all unpleasant facts from the jury's consideration[.]" *Commonwealth v. Tyson*, 119 A.3d 353, 360 (Pa. Super. 2015) (quoting *Dillon*, 925 A.2d at 141).

Jesse Braswell testified for the Commonwealth regarding his involvement with Dominic Carter in six burglaries to which he pleaded guilty. Braswell testified that he and Carter used Defendant as their fence in offloading some of the property stolen in those burglaries including jewelry and precious metals. He testified that upon arriving to sell the stolen items Defendant would sometimes ask "who did you fuck today?" T6 128: 11-16. A reasonable inference can be made that Defendant knew the property was stolen or believed that it was probably stolen. He stated that at no point did Defendant ask for his name or identification or that of Carter, despite the fact that Braswell and Carter sold items to Defendant on at least ten occasions. T6 122: 2-11. Defendant would regularly avoid making the required records of the purchase and sale of precious metals when such transactions involved property that Defendant knew was stolen or believed was probably stolen.

24

This evidence tends to prove that Defendant's failure to maintain records regarding items sold to him by Officer Scott and the burglars in this case was not a mistake. Evidence of a prior crime may be admitted to show a defendant's actions were not the result of a mistake or accident, "where the manner and circumstances of two crimes are remarkably similar." *Commonwealth v. Kinard,* 95 A.3d 279, 294–95 (Pa. Super. 2014). Moreover, the probative value is not outweighed by the danger of unfair prejudice. The court was highly cognizant of the fact that this evidence could not be used to establish Defendant's propensity to act in accordance with this conduct, just as a jury would have been instructed. Though the evidence may be harmful to Defendant, when properly considered it was not unfairly prejudicial. Accordingly, the court properly admitted the evidence of Defendant's prior encounters with Braswell.

### 4. Officer Scott's Testimony Regarding His June 17, 2016 Conversation with Defendant

On January 6, 2019, Defendant filed a motion to preclude the recordings created by Officer Scott on June 16, 2016 and June 17, 2016 of conversations he had with Defendant while working in an undercover capacity. Pursuant to the Wiretapping and Electronic Surveillance Control Act, law enforcement officers like Officer Scott are permitted to intercept and record electronic or oral communications involving suspected criminal activities as long as that officer has given prior written consent and has the authorization of the Attorney General, a Deputy Attorney General designated in writing by the Attorney General, the District Attorney or an Assistant District Attorney designated in writing. 18 Pa.C.S. § 5704(2)(ii).

Although Officer Scott consented to the recording, the written authorization from the Philadelphia District Attorney's Office was effective from April 7, 2016 to May 7, 2016 only. T1 64:11-16. Accordingly, the court suppressed the recordings of Officer Scott's conversations with Defendant that fell outside of that period of authorization and consent, including those made

25

on June 16 and June 17, 2016. *See Commonwealth v. Clark*, 542 A.2d 1036, 1041 (Pa. Super. 1988) (proper remedy where recordings fell outside time frame of consent and authorization was suppression).

The Commonwealth then sought to elicit Officer Scott's independent recollection of these conversations. T3 98:17-24. The court allowed Officer Scott to be examined to determine if he could recall these conversations independent of his memory being refreshed by the recordings. *See Commonwealth v. Metts*, 787 A.2d 996, 1005-06 (Pa. Super. 2001) (allowing testimony regarding the substance of a conversation where the recording of the conversation had been suppressed and witness was "thoroughly cross-examined regarding his ability to recall the conversations"). Defendant also argued that the June 17, 2016 recording and any testimony related to conversations between Officer Scott and Defendant that occurred on that day were the fruit of the illegally recorded conversation of June 16, 2016 and should have been precluded as fruit of the poisonous tree. T3 83:2-11.

Officer Scott initially testified that he had an independent recollection of his conversation with Defendant on those days. T3 10:12-16. Officer Scott further testified that he created contemporaneous notes of the conversations which he reviewed before the trial. T3 47:13-15.[15] Officer Scott testified that he had reviewed the recordings "a couple of times" in 2018 which improved his memory of the conversations. T3 52:23-53:13. He also testified reviewed his notes and tested their accuracy against the recordings. T3 at 52:14-18.

After hearing Officer's Scott testimony regarding his independent recollection of the events and conversations, the court determined that there was substantial ambiguity and uncertainty regarding the source of his recollection of these conversations and whether they had been tainted by listening to the illegal recordings and review of his unproduced notes. The court

_____

[15] These notes had not been disclosed in discovery. T3 47:17-24.

26

then struck all of Officer Scott's testimony regarding his interactions and conversations with Defendant on June 16, 2016 and June 17, 2016. T4 36:4-37:13. Accordingly, this testimony was not considered by the court and did not play any role whatsoever in evaluating the evidence of Defendant's guilt.

### 5. Use of the Audio Recording of Officer's Scott's June 17, 2016 Conversation with Defendant at Sentencing

The Commonwealth sought to introduce the June 17, 2016 audio recording at Defendant's sentencing. N.T. Sentencing, 4/5/19, at 7:15-17. Defendant objected on the basis that this recording had already been suppressed at trial. N.T. Sentencing, 4/5/19, at 9:4-11. The court ruled that the audio recording was admissible at sentencing. N.T. Sentencing, 4/5/19, at 12:14-17

Defendant argues that the suppressed recording of the June 17, 2016 conversation between Officer Scott and Defendant was improperly introduced at Defendant's sentencing hearing. The court has been unable to locate any authority within this jurisdiction that squarely addresses this issue. However, federal courts have ruled that given the purpose of the exclusionary rule in combination with practical and policy considerations, including broad judicial discretion in sentencing and the need for information to fashion an appropriate sentence, "reliable evidence, although illegally seized and excluded from trial, if not gathered to influence the sentencing judge, is admissible for sentencing purposes." Casenote, 71 Colum. L. Rev. 1102 (1971) (citing *United States v. Schipani*, 315 F. Supp. 253 (E.D.N.Y.), *aff'd*, 435 F.2d 26 (2d Cir. 1970), *cert. denied*, 401 U.S. 983 (1971)). "Absent some special situation, no appreciable increment in deterrence would result from applying a second exclusion at sentencing after the rule has been applied at the trial itself." *Schipani*, 315 F. Supp. at 258.

The Supreme Court of the United States has explained that in deciding upon a proper sentence, "a judge may appropriately conduct an inquiry broad in scope, largely unlimited either as to the kind of information he may consider, or the source from which it may come." *United States v. Tucker*, 404 U.S. 443, 446, 92 S.Ct. 589, 591, 30 L.Ed.2d 592 (1972). Moreover, the law of evidence is not rigidly applied in a sentencing hearing. *See* Pa.R.E. 101 Comment ("Traditionally, our courts have not applied the law of evidence in its full rigor in proceedings such as preliminary hearings, bail hearings, grand jury proceedings, sentencing hearings, parole and probation hearings, extradition or rendition hearings, and others.").

There was no evidence that the recording made on June 17, 2016 by Officer Scott was not reliable. Nor was there any evidence that the recording was made for the specific purpose of influencing the court at sentencing.[16] Accordingly, and in consideration of the purposes of the exclusionary rule and the desirability of reaching an appropriate decision in sentencing, the court properly admitted the recording at Defendant's sentencing hearing.

## 6. Sentence

On January 18, 2019, at the close of Defendant's bench trial, he was convicted of nine offenses: under Bill of Information 1354-2017, Defendant was convicted of counts seven, eight, and nine (Receiving Stolen Property graded as misdemeanors of the third degree); counts ten, eleven, and twelve (records offenses under the Precious Metals Act graded as misdemeanors of the third degree); count seventeen (conspiracy to receive stolen property graded as a misdemeanor of the third degree); and count eighteen (conspiracy to receive stolen property graded as a felony of the third degree). Under Bill of Information 7941-2017, Defendant was convicted of count one (Receiving Stolen Property graded as a felony of the third degree).

---

[16] The recording involves Officer Scott selling jewelry to Defendant and telling Defendant that "it's hot" and he should "melt it down fast" and "get rid of it." Defendant replied "I know you don't need to tell me."

28

Defendant's prior record score was zero. N.T. Sentencing, 4/5/2019, at 4:14-25. The offense gravity score for each of the felony counts was five, and the offense gravity score was one for each of the misdemeanor counts. *Id.*

Accordingly, on the felony counts, the guideline range was restorative sanctions to nine months, with the aggravated range being twelve months. *See* 204 Pa. Code § 303.16(a) (sentencing matrix); 204 Pa. Code § 303.13(a)(4) (aggravated range for offense gravity score of five is an additional three months). For the misdemeanor counts, the guideline range was a sentence of restorative sanctions. *See* 204 Pa. Code § 303.16(a) (sentencing matrix). Additionally, if no period of confinement was imposed on the misdemeanor counts, the guideline range for fines should be calculated by taking Defendant's hourly wage, or the minimum wage, whichever was higher, and multiplying it by 25-50. *See* 204 Pa. Code § 303.14(a). The presentence investigation report stated that Defendant made about $3,000 per week, working more than 40 hours per week. N.T. Sentencing, 4/5/2019, at 6:3-8. Using these figures, the statutory maximum of $2,500 was within the guidelines.

The court sentenced Defendant on April 5, 2019. On counts seven, eight, nine and seventeen of 1354-2017, related to the misdemeanor counts of receiving stolen property and conspiracy to same, Defendant was sentenced to one year of probation each, plus a $2,500 fine on each. This was within the guidelines. On counts ten, eleven and twelve of 1354-2017, the records offenses, Defendant was sentenced to pay a fine of $2,500 on each without any probationary period. This was also within the guidelines. Finally, on count eighteen of 1354-2017, and count one of 7941-2017, the felony counts for receiving stolen property and conspiracy to do the same, Defendant was sentenced to 12-36 months imprisonment and a $15,000 fine on each. The two felony sentences were in the aggravated guideline range; the fine

29

guidelines do not apply to confinement sentences. All of the sentences are consecutive. In total, Defendant must pay a fine of $47,500, serve between two and six years in state prison, and spend four years on probation consecutive to his imprisonment and any subsequent time spent on parole.

Defendant's appeal of the felony sentences in the aggravated range should be denied because it does not raise a substantial question about the appropriateness of the sentence. On appeal, Defendant challenges his sentence in the aggravated guidelines range. In other words, he challenges the discretionary aspects of his sentence. There is no absolute right to appeal the discretionary aspects of a sentence. 42 Pa.C.S. § 9781(b). Prior to reviewing the discretionary aspects of a sentence, the Superior Court must find that "there is a substantial question that the sentence appealed from is not appropriate under the Sentencing Code." *Commonwealth v. Moury*, 992 A.2d 162, 170 (Pa. Super. 2010). "Generally, if the sentence imposed falls within the sentencing guidelines, no substantial question exists." *Commonwealth v. Maneval*, 688 A.2d 1198, 1199-1200 (Pa. Super. 1997). Where a sentencing court sentences within the guidelines, such a sentence should only be vacated where "the case involves circumstances where the application of the guidelines would be clearly unreasonable." 42 Pa.C.S. § 9781(c)(2).

In extraordinary cases, a guideline sentence may be unreasonable. For instance, in *Commonwealth v. Whitman*, 880 A.2d 1250 (Pa. Super. 2005), *rev'd in part on other grounds*, 918 A.2d 115 (Pa. 2007), appellant was charged with theft, trespass, receiving stolen property, and burglary, and he received consecutive guideline sentences on each amounting to 39 to 78 years. *Id.* at 1253-54. The Superior Court reversed, noting that the sentencing court failed to consider the statutory sentencing factors. *Id.* In contrast, in this case, Defendant's aggregate

30

sentence is much shorter, and the court properly considered the appropriate factors on the record. N.T. Sentencing, 4/5/19, at 57:17-60:11

In determining the sentence, the court considered the information within the Presentence Investigation, the trial transcript, the victim statements and all other evidence presented at sentencing as well as § 9722, § 9725 and § 9726 of the Sentencing Code. N.T. Sentencing, 4/5/19, at 59:24-60:11. Though the court found that the statutory factors relevant to probation generally did not favor Defendant, the court nevertheless imposed the standard guidelines range sentence of restorative sanctions on all misdemeanor counts. N.T. Sentencing, 4/5/19, at 54:9-57:16.

Turning to the sentence of total confinement, the court found that Defendant's conduct fell far outside the typical receiving stolen property case because the buying and selling of stolen property was an integral part of his professional business which helped promote residential burglaries. N.T. Sentencing, 4/5/19, at 59:5-23. The burglaries involved in this case were performed by career criminals and were highly sophisticated, using methods designed to avoid setting off alarms and later detection. In the Drebin burglary, the burglars appeared to enter through the second story, ostensibly to avoid setting off alarms. In the Audet, burglary they appeared to crawl on the floor to avoid the alarms, and wore gloves to avoid leaving fingerprints. The court found that this departure from the typical case meant that defendant's incarceration was necessary to recognize the gravity of the offense and to protect the public. N.T. Sentencing, 4/5/19, at 58: 16-19. Finally, the court found that Defendant presented a high risk of reoffending while on probation, that a period of probation would depreciate the seriousness of the offenses, and that Defendant could most effectively be rehabilitated in a correctional institution. N.T. Sentencing, 4/5/19, at 57:17-58:15. Because the sentence imposed was within the guidelines,

31

and was supported by record findings as to the unique nature of Defendant's conduct, Defendant's challenge to the aggravated sentence raises no substantial question. *See Commonwealth v. Fullin*, 892 A.2d 843, 848-49 (Pa. Super. 2006) (where finding that "not only did Appellant commit a crime, but he committed it in an atypically objectionable way and it had an atypically harmful result" supported a sentence in the aggravated range).

In regard to the imposition of fines, Defendant is again challenging the discretionary aspects of his sentence, so he must raise a substantial question of appropriateness. A defendant may be sentenced to pay a fine in addition to other punishments, such as confinement or probation, when the court finds that the crimes being punished were committed for pecuniary gain or that such fine is specially adapted to the crime or the correction of the defendant. 42 Pa.C.S. § 9726(b). A court may also impose a fine alone as punishment. 42 Pa.C.S. § 9726(a). When a fine is imposed in addition to a sentence of confinement, there are no guideline restrictions other than the lawful maximum; when no confinement is imposed, the guidelines specify restrictions spelled out above. 204 Pa. Code § 303.14(a).

In this case, Defendant's fine sentences were all within guidelines ranges. As to the felony counts for which he was ordered to undergo imprisonment, there is no guideline other than the lawful maximum. For the misdemeanor counts on which he was sentenced to probation in addition to a fine, or on which he was sentenced to pay a fine alone, the amounts required are within the guidelines, based on the calculations above. Moreover, the record contains support for the rationale behind the fines imposed. The sentencing court expressly relied on the Presentence Investigation's finding that Defendant earned $3,000 per week, had a home worth $180,000, and had monthly liabilities of only $812 in finding the fines appropriate. N.T. Sentencing, 4/5/19, at 60: 4-11. The court also found that Defendant committed his crimes as a regular and intentional

32

part of his business. N.T. Sentencing, 4/5/19, at 59: 17-23. Based on this finding, the court concluded that Defendant committed his crimes for pecuniary gain and that a fine would be specially adapted for deterrence of similar economic crimes. N.T. Sentencing, 4/5/19, at 58: 20-59:3. Because the court sentenced within the guidelines after considering the statutory factors for imposition of a fine and application of the guidelines was not clearly unreasonable, there is no substantial question as to the appropriateness of the sentence.

## CONCLUSION

For the foregoing reasons, the court respectfully recommends that Defendant's judgment of sentence be AFFIRMED.

BY THE COURT

_____
Richard P. Haaz,                                    J.

Copies sent on ⁷/₂₃/₁₉ to:

**By interoffice mail:**
Kevin Steele, Esquire, District Attorney
Robert Falin, Esquire, ADA
Clerk of Courts
**By first class mail:**
Gregory DiPippo, Esquire

_____
Judicial Secretary

33